KENNETH R. DAVIS II (OSB 971132)
davisk@lanepowell.com
PARNA A. MEHRBANI (OSB 053235)
mehrbanip@lanepowell.com
TIFFANY SCOTT (WSB 41740)
scottt@lanepowell.com
LANE POWELL PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
Telephone:  503.778.2100
Fax:  503.778.2200

*Pro hac vice* application pending

STEPHEN S. SMITH (CSB 166539)
ssmith@greenbergglusker.com
RACHEL VALADEZ (CSB 252415)
rvaladez@greenbergglusker.com
GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
1900 AVENUE OF THE STARS, 21ST FLOOR
LOS ANGELES, CA  90065
Telephone:  310.553.3610
Fax:  310.553.0687

Attorneys for Defendant
GOLDEN TEMPLE OF OREGON, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIBIJI INDERJIT KAUR PURI, an individual,<br><br>                    Plaintiff,<br><br>v.<br><br>GOLDEN TEMPLE OF OREGON, LLC, an Oregon limited liability corporation; DOES 1 through 10,<br><br>                    Defendants. | Case No.  CV10-882 JFW - VBK<br><br>**DECLARATION OF KENNETH R. DAVIS II IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO MAKE MORE DEFINITE AND CERTAIN AND, IN THE ALTERNATIVE, TO COMPEL ARBITRATION**<br><br>[Notice of Motion and Motion and [Proposed] Order filed concurrently herewith]<br><br>Date: Monday, April 12, 2010<br>Time: 1:30 p.m.<br>Place: Courtroom 16, 312 N. Spring St., Los Angeles, CA 90012 |

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

## DECLARATION OF KENNETH R. DAVIS II

I, Kenneth R. Davis II, declare and testify as follows:

1.     I am a shareholder at the law firm of Lane Powell PC and counsel for Defendant Golden Temple of Oregon, LLC ("Golden Temple" or "Defendant") in the above-captioned matter and submit this Declaration based on personal knowledge and in support of Defendant's Motion to Dismiss Or, In the Alternative, To Make More Definite and Certain and, In the Alternative, to Compel Arbitration.

2.     Attached hereto as Exhibit A is a true and correct copy of the License Agreement dated October 1, 2004, entered into between Harbhajan Singh Khalsa Yogiji, as Trustee of the Harbhajan Singh Khalsa Yogiji and Inderjit Kaur Living Trust (the trust created by Yogi Bhajan and Bibiji), and Golden Temple.

3.     Attached hereto as Exhibit B is a true and correct copy of the License Agreement dated July 26, 2004, entered into between Harbhajan Singh Khalsa Yogiji, as Trustee of the Harbhajan Singh Khalsa Yogiji and Inderjit Kaur Living Trust (the trust created by Yogi Bhajan and Bibiji), and Golden Temple.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 12 day of March 2010, at Portland, Oregon.



Kenneth R. Davis II

LANE POWELL PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158

# EXHIBIT A

## NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT

This Nonexclusive Trademark License Agreement (the "Agreement") is made effective as of this 1st day of OCTOBER, 2004, among Harbhajan Singh Khalsa Yogiji, Trustee of the Harbhajan Singh Khalsa Yogiji and Inderjit Kaur Living Trust (the "Licensor"), Golden Temple of Oregon, Inc., an Oregon corporation ("Licensee") and, as to Section 15, Harbhajan Singh Khalsa Yogiji, individually.  Licensor and Licensee are sometimes referred to as the Parties to this Agreement.

### RECITALS

A.      Licensor and Licensee have previously concluded several licensing agreements, each of which is terminated by this Agreement, with this Agreement to be a full and complete substitute for all prior licensing agreements between the Parties.

B.      The terms of this Agreement reflect the desire of Licensor to maintain the existing level of royalty income and the desire of Licensee to pay reduced royalty rates for increasing levels of its Gross Sales.

In consideration of the mutual covenants and undertakings set forth below, it is agreed as follows:

1.      **Definitions.**

1.1      The term **"Confidential Information"** shall mean this Agreement and all confidential or otherwise proprietary business and technical information relating to the Parties and their respective business plans as well as any intellectual property disclosed by either Party under this Agreement. Confidential Information includes, but shall not be limited to, ideas, inventions, discoveries, improvements, know-how, trade secrets, drawings, blue-prints, long-range and short-range plans, production, manufacturing and sales techniques, financial statements and data, information, recipes, formulas, sources of supply, advertising, actual and prospective customers, pricing, costing, and accounting procedures. Notwithstanding the foregoing, Confidential Information shall not include information that:

(a)      is in the public domain at the time of disclosure by the disclosing Party;

(b)      enters the public domain after disclosure by the disclosing Party through no fault of the receiving Party;

(c)      was or is separately disclosed to the receiving Party by a third party not itself subject to an obligation of confidentiality to the disclosing Party with respect to such information;

(d)      was in the receiving Party's possession at the time of disclosure by the disclosing Party; or

(e)      was independently developed by the receiving Party without any use of the disclosing Party's Confidential Information.

1 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT (includes final comments from Harijot 3/23/04)
PDX/032833/082268/RDL/Comparite of 1123208 v5 and v7

708400-4

EXHIBIT A
PAGE 3

1.2     The term **"HSKY Marks"** and **"Marks"** shall mean any trademark, servicemark, logo, insignia, seal, design, or other symbol or device used by or identifying Harbhajan Singh Khalsa Yogiji (also known as Yogi Bhajan), specifically including the name of Harbhajan Singh Khalsa Yogiji, or Yogi Bhajan, any likeness of him approved in accordance with this Agreement, and a facsimile of his signature confirming any statement of 150 words or less (approved in accordance with this Agreement) as his statement.

1.3     The term **"Gross Sales"** shall mean the total dollar amount of gross sales of Licensed Products by Licensee, after deducting any credits for returns actually made or allowed (as supported by credit memoranda actually issued to customers). The gross sale price of all Licensed Products must be reasonably determined by Licensee and must reflect any commercially reasonable price reduction, clearance sale pricing and other marketing discounts. Gross Sales resulting from sales to any party directly or indirectly related to or affiliated with Licensee shall be computed based on regular selling prices to the trade. No other costs incurred in the manufacturing, selling, advertising, and distribution of the Licensed Products shall be deducted in calculating Gross Sales, nor shall any deduction be allowed for any uncollectible accounts or allowances.

1.4     The term **"Licensed Trademarks"** shall mean the Marks as defined in Section 1.2 and listed on the attached <u>Exhibit 1.4</u>, which Exhibit may be amended from time to time by mutual agreement of the parties.

1.5     The term **"Licensed Products"** shall mean any product or part thereof bearing a Licensed Trademark and listed on the attached <u>Exhibit 1.5</u>, which Exhibit may be amended from time to time by mutual agreement of the parties.

2.     **Grant of License.**

2.1     Until terminated, as provided herein, Licensor hereby grants Licensee (1) an exclusive license to use Licensed Trademarks on Licensed Products anywhere in the world and (2) a non-exclusive license to manufacture, sell and distribute tea and chai Licensed Products in North America, central America, South America, Russia, and Australia and all other Licensed Products anywhere in the world, each in accordance with the terms of this Agreement.

2.2     No right is granted to Licensee to sublicense or otherwise transfer the right to use the Licensed Trademarks to third parties. No license is granted to Licensee hereunder for the manufacture, sales or distribution of Licensed Products to be used as premiums, for publicity purposes, for fund-raising, as giveaways, in combination sales, or to be disposed of under similar methods of merchandising. Licensee may not use any Licensed Trademarks in connection with any sweepstakes, lottery, game of chance, or similar promotional or sales device, scheme, or program.

2.3     Licensor's grant to Lciensee of the limited right to use a facsimile of the signature of Harbhajan Singh Khalsa Yogiji or Yogi Bhajan, in accordance with this Agreement, shall not be construed as a waiver, revocation, or relinquishment of any prior written prohibitions against such use by others.

*not in 10 yr. version*

2 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT (includes final comments from Harijot 3/23/04)



EXHIBIT A
PAGE 4

3.    **KRI Approval.**

3.1    Each likeness of Yogi Bhajan must be approved in writing by Kundalini Research Institute ("KRI"), a California nonprofit corporation, for its consistency with the maintenance of the dignity of the teachings of Yogi Bhajan.

3.2    Each statement of 150 words or less must be verified for accuracy by KRI, with such verification to be confirmed in writing by KRI before any use of the statement by Licensee.

3.3    Any use of Yogi Bhajan copyrighted yogic or meditation technology must be verified for accuracy by KRI, with such verification to be confirmed in writing by KRI before any use of such technology by Licensee. Each use of Yogi Bhajan copyrighted yogic or meditation technology by Licensee must be accompanied by a copyright mark.

3.4    No Yogi Bhajan likeness, statement of 150 words or less, or Yogi Bhajan copyrighted yogic or meditation technology will be regarded as approved by KRI notwithstanding Licensee's receipt of a written statement from KRI confirming such approval, until Licensee has paid to KRI the fee invoiced to Licensee by KRI for its review and approval service.

4.    **Quality Assurance.**

4.1    To assure Licensor that its Licensed Products are comparable or better in quality to the other saleable merchandise in the Territory, Licensee agrees to submit, at Licensee's expense, samples of all proposed Licensed Products, including material modifications to such Licensed Products, to Licensor prior to any use, sale or other distribution to the public. Licensee agrees to withhold any use, sale or other distribution of such proposed Licensed Products until it receives written approval by Licensor. Licensor may withhold approval of proposed Licensed Products for any reason. Licensor agrees to promptly and reasonably respond to all such submissions.

4.2    Licensee agrees to maintain such reasonable manufacturing, servicing and quality standards as may from time to time be requested by Licensor. Licensee shall assure Licensor that Licensed Products manufactured and/or sold by it meet or exceed the quality and specifications of the samples approved by Licensor.

5.    **Trademark Use and Ownership.**

5.1    Licensee agrees to submit to Licensor copies of any packaging, advertisements or promotional materials containing Licensed Trademarks for Licensor's approval prior to any use thereof. Licensee agrees to remove any material which is objectionable to Licensor.

Licensor may withhold approval of any packaging, advertisements or promotional materials containing Licensed Trademarks for any reason. Licensor's approval in accordance with this Section 5.1 must be in writing with the following exceptions:

(a)    Licensor will be deemed to have approved any proposed use of a Licensed Trademark for a Licensed Product if that Licensed Trademark was previously approved for use

3 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT (includes final comments from Harijot 3/23/04)
PDX/032833/082268/RDL/Comparite of 1123208 v5 and v7

EXHIBIT A
PAGE 5


for a different Licensed Product unless Licensor disapproves such use within thirty (30) days after approval is requested by Licensee in writing.

      (b)    Licensor will be deemed to have approved any proposed use of a Licensed Trademark for a Licensed Product unless Licensor disapproves such use within sixty (60) days after approval is requested by Licensee in writing.

    5.2    Licensee acknowledges Licensor's exclusive rights in and to the Licensed Trademarks, that the Licensed Trademarks are unique and original to Licensor and that Licensor is the owner thereof. Licensee agrees that it will not, during the term of this agreement or thereafter, challenge, dispute or contest, directly or indirectly, Licensor's exclusive right and title to the Licensed Trademarks or the validity thereof. Licensee agrees that it shall not apply for registration or otherwise seek to obtain ownership of any Licensed Trademarks, or any mark confusingly similar to any Licensed Trademarks, in any country.

    5.3    Licensee agrees that its use of the Licensed Trademarks inures to the benefit of Licensor and that Licensee shall not acquire any rights in the Licensed Trademarks. Licensee acknowledges the good will associated with the Licensed Trademarks and that all rights therein belong exclusively to Licensor.

6.    **Rights Fee and Royalties.**

    6.1    Licensee agrees to pay Licensor a royalty equal to Gross Sales for all Licensed Products sold by Licensee. The applicable royalty rate for each transaction yielding Gross Sales is specified on Exhibit 6.1 attached. Royalty payments shall be made monthly, and not later than fifteen (15) days following the end of each calendar month. All royalties shall be paid in U.S. dollars to Licensor at its address set forth in Section 17.

    6.2    A royalty obligation shall accrue upon the sale of the Licensed Products regardless of the time of collection by Licensee. A Licensed Product shall be considered "sold" upon the date when such Licensed Product is billed, invoiced, shipped or paid for, whichever event occurs first.

    6.3    Upon termination of this Agreement, all royalty obligations shall be accelerated and shall immediately become due and payable.

    6.4    Licensee's obligations for the payment of a royalty shall survive termination of this Agreement and will continue for so long as Licensee continues to manufacture, sell or otherwise market the Licensed Products.

    6.5    If the Licensee elects to extend the term of this Agreement in accordance with Section 9.1, the royalty rate specified on Exhibit 6.1 must be adjusted for Gross Sales during the extended term of the Agreement. The adjusted royalty rate will be as agreed by the Parties. If the Parties cannot agree on an adjusted royalty rate within thirty (30) days after the Licensee's election to extend the term of this Agreement, the royalty rate must be determined by appraisal of an accredited senior appraiser with the American Society of Appraisers acceptable to both Parties. If the Parties cannot agree on an appraiser, the appraiser shall be designated by the presiding judge of the court of general jurisdiction located in the county in which is located the

4 – NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT (includes final comments from Harijot 3/23/04)

PDX/032833/082268/RDL/Comparite of 1123208 v5 and v7



Licensee's principal place of business.  The appraiser to be so designated must be an accredited senior appraiser with the American Society of Appraisers.

7.    **Accounting and Reporting.**

   7.1    Licensee shall submit to Licensor monthly reports of all its Gross Sales of Licensed Products.  These reports shall itemize all sales of Licensed Products by units, dollars, and product category and style. The receipt or acceptance by Licensor of any royalty statement, or the receipt or acceptance of any royalty payment made, shall not prevent Licensor from subsequently challenging the validity or accuracy of such statement or payment.

   7.2    Licensee shall keep account books, records and duplicates of all invoices to customers showing the manufacture and sales or other distribution of Licensed Products. The books, records and invoices shall be maintained for a period of at least five (5) years after the payment of the corresponding royalty and shall be available for inspection and copying by duly authorized representatives of Licensor during regular business hours upon reasonable notice. Licensee shall cooperate fully with Licensor in making the inspection.

   7.3    Once during each year in which this Agreement is in effect, and once after termination of this Agreement, Licensor shall be entitled to an independent audit of Licensee's account books, records, invoices and other pertinent data.  The audit shall be conducted at Licensee's place of business during normal business hours.  In the event that such inspection reveals a discrepancy in the amount of royalty owed Licensor from what was actually paid, Licensee shall immediately pay such discrepancy, plus interest calculated at the rate of one and one-half percent (1.50%) per month.  The cost of the audit will be paid by Licensor unless the audit shows that Licensee understated sales of Licensed Products by more than five percent (5%), in which case Licensee shall pay Licensor's costs of the audit, including all professional fees incurred.

   7.4    The requirements of this Section 7 shall survive termination of this Agreement.

8.    **Confidentiality.**  Each Party agrees to maintain in strict confidence and, except to the extent expressly permitted in this Agreement or otherwise consented to in writing by the other Party, not to use any Confidential Information received from the other Party except in connection with this Agreement. Each Party agrees to use reasonable efforts to protect the confidentiality of any Confidential Information received from the other Party and to prevent third party access to any documents or other items containing Confidential Information received from the other Party. Each Party agrees to treat the other's Confidential Information with the same degree of confidentiality and care as it treats its own Confidential Information, which shall be no less than reasonable care.  The obligations of confidentiality and non-use contained in this Agreement will remain in effect perpetually, surviving any expiration or termination of this Agreement.  Nothing in this Agreement shall modify or limit the confidentiality obligations of either Party arising under any other agreement.

9,    **Duration and Termination.**

   9.1    **Duration.**  The present Agreement is concluded for a period of ten (10) ~~seventy-five (75)~~ years, subject to Licensee's right to elect to extend the term of this Agreement for an

5 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT (includes final comments from
        Harijot 3/23/04)
PDX/032833/082268/RDL/Comparite of 1123208 v5 and v7


EXHIBIT A
PAGE 7

additional ten (10) years by notice to Licensor of such election. The Licensee's election must be provided no earlier than one year, and no later than 90 days, prior to the end of the then term of this Agreement. In the event that Licensee elects to extend the term of this Agreement, all of the terms and conditions of this Agreement (including Licensee's right to elect to further extend the term of this Agreement in accordance with this Section 9.1) shall apply during the term as so extended and the royalty rate specified on Exhibit 6.1 attached must be adjusted in accordance with Section 6.5.

9.2     **Termination upon Default.** At any time during the term of this Agreement, either Party may terminate this Agreement upon sixty (60) days' written notice to the other Party if the other Party is in material breach in the performance of any of its obligations hereunder and (i) fails to cure the breach within sixty (60) days after receiving written notice of it, or (ii) if more than sixty (60) days is reasonably required to cure such breach, fails to commence in good faith and diligently to cure such breach within said sixty (60) day period.

9.3     **Termination by Agreement.** The Parties may terminate this Agreement at any time by mutual written agreement.

9.4     **Effect of Bankruptcy or Insolvency.** Licensor may terminate this Agreement in the event: (a) Licensee has ceased its business activities or has otherwise begun winding up its business affairs; (b) bankruptcy, reorganization, arrangement, or insolvency proceedings or other proceedings for relief under any bankruptcy or similar law or laws for the relief of debtors, are instituted by or against Licensee and are not dismissed within one hundred twenty (120) days; (c) a custodian, liquidator, receiver, or trustee is appointed for Licensee or the major part of its property; or (d) Licensee becomes insolvent or bankrupt, makes an assignment for the benefit of its creditors or makes any comparable arrangement with its creditors.

9.5     **Effect of Termination or Expiration.** Subject to the terms of this Section 9.5, termination of this Agreement by Licensor upon default by Licensee shall terminate all rights and licenses granted to Licensee under this Agreement, and Licensee agrees to cease its use, purchase, production and sale of the Licensed Products. Notwithstanding the foregoing, in the event of termination for default, Licensee shall have a limited license to continue to supply Licensed Products to customers from whom Licensee has received orders prior to Licensee's receipt of the notice of termination for a period of one (1) year from the date of termination, so long as Licensee continues to satisfy its royalty obligations under this Agreement.

9.6     **Equitable Remedies.** Licensee acknowledges that money damages alone are inadequate to compensate Licensor for any breach by Licensee of the Agreement. Therefore, in the event of a breach or threatened breach of any provision of the Agreement by Licensee, Licensor may, in addition to all other remedies, immediately obtain and enforce injunctive relief prohibiting the breach or compelling specific performance.

10.     **Notice of Infringement.** Licensee agrees to notify Licensor promptly of any known use of Licensed Trademarks by others not duly authorized by Licensor. No action, other than the above notification to Licensor, shall be taken by the Licensee for enforcement of any Licensed Trademarks subject to this Agreement.

6 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT (includes final comments from
        Harijot 3/23/04)
PDX/032833/082268/RDL/Comparite of 1123208 v5 and v7



EXHIBIT A
PAGE 8

11.    **Indemnification.**  Licensee shall indemnify, defend, and hold harmless Licensor, and its trustees, officers, directors, employees and agents from and against any and all claims, demands, damages, liabilities or judgments arising out of or in connection with Licensee's performance of this Agreement or Licensee's exercise of the license granted by this Agreement, including but not limited to any and all liability caused by or arising from the suitability for use or merchantability of any item manufactured or sold pursuant to this Agreement or the use of any Licensed Trademark pursuant to this Agreement.

12.    **Insurance.**

12.1    During the term of this Agreement, Licensee shall maintain in effect insurance in the combined amount of $1,000,000 per occurrence for bodily injury and property damage against claims, demands, or causes of action or damages, including reasonable attorney's fees, arising out of any alleged defects in the Licensed Products or in the use thereof. The insurance policy(ies) shall include an endorsement naming Licensor as an additional insured insofar as this Agreement is concerned, and provide that notice shall be given to Licensor at least 30 days prior to cancellation or material change in the form or substance of such policy(ies).

12.2    Licensee shall promptly furnish Licensor with appropriate certificate(s) of insurance together with the endorsement(s) required herein. Licensee shall not commence performance under this Agreement until certificate(s) of insurance and endorsement are submitted. Licensee shall annually furnish Licensor, on the anniversary of this Agreement, appropriate certificate(s) of insurance and endorsement.

13.    **Termination of Prior Agreements.**  All prior licensing agreements between Licensor and Licensee are hereby terminated.

14.    **Grant of Recipe/Formula License.**

14.1    **License.**  Licensor hereby grants to Licensee the exclusive and perpetual license in the Exclusive Territory to develop, make, use, sell and offer for sale Products to the Licensed Market, and to incorporate into marketing and packaging of each Product words (but in no event more than 25 words) which communicate that the Product was developed or formulated by Yogi Bhajan for Yogic and Ayurvedic processes.

14.2    **Definitions.**  For purposes of this Section 14, the following terms have the definitions specified below.

(a)    **"Exclusive Territory"** means with respect to tea and chai Products, North America, Central America, South America, Russia and Australia; and with respect to all other products, the world.

(b)    **"Licensed Market"** means the food, body care and health products market.

(c)    **"Product"** means any food, body care or health product using any recipe or formulae previously developed by Yogi Bhajan or treated by Licensor and Licensee as so developed under a prior licensing agreement.

7 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT (includes final comments from Harijot 3/23/04)



EXHIBIT A
PAGE 9

14.3   **Payment for License.** In consideration for the license granted in Section 14.1, Licensee will execute and deliver to Licensor that promissory note attached as **Exhibit 14.3.** This promissory note must be executed and delivered simultaneously with execution of this Agreement.

15.   **New Recipes/Formulae.**

15.1   **New Recipes/Formulae.** Harbhajan Singh Khalsa Yogiji hereby acknowledges and agrees that (1) each recipe or formula he may develop subsequent to the effective date of this Agreement for any Product is to be licensed in accordance with Section 14.1; and (2) he will not develop any recipe or formula for any product other than a food, body care or health product without first granting to Licensee the first right to purchase such recipe or formula or license sales of such product, with Licensee to have sixty (60) days in which to exercise such right, and with Harbhajan Singh Khalsa Yogiji prohibited from selling the recipe or formula or licensing sales of such product at a price or on terms more favorable to the purchaser or licensee than the terms first offered to Licensee.

15.2   **Consideration.** In consideration of the obligations of Harbhajan Singh Khalsa Yogiji under Section 15.1, Licensee agrees to pay to Harbhajan Singh Khalsa Yogiji the sum of Two Thousand Five Hundred Dollars ($2,500.00) per month. Licensee's obligation to make these monthly payments will terminate at the death of Harbhajan Singh Khalsa Yogiji.

16.   **Modifications and Waiver.**

16.1   This Agreement shall not be amended or modified except in a writing signed by each party affected by the agreement or modification.

16.2   No waiver by either Party of any breach or default of any of the provisions of this Agreement shall be deemed a waiver as to any subsequent and/or similar breach of default.

17.   **No Joint Venture.** Nothing contained herein shall constitute this arrangement to be that of employment, joint venture or partnership.

18.   **Assignability.** This Agreement shall inure to the benefit of Licensor, its successors and assigns, but will be personal to Licensee and shall be assignable by Licensee only with the prior written consent of Licensor.

19.   **Dispute Resolution; Attorney Fees.** Any controversy or claim arising out of, or relating to, this Agreement, or the making, performance, or interpretation of this Agreement, shall be settled by arbitration in Portland, Oregon, in accordance with the rules and procedures of Arbitration Services of Portland, Inc., or if that organization is not then in existence, in accordance with the provisions of ORS 33.210-33.250. Judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy. The prevailing party in the arbitration shall be entitled to its reasonable costs and attorney fees in connection therewith. The determination of who is the prevailing party, what are reasonable costs, and the amount of attorney fees to be paid to the prevailing party shall be decided by the arbitrator(s) (with respect to all recoverable attorney fees incurred prior to and during the arbitration proceedings) and by the court or courts, including any appellate court, that hears any

8 – NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT (includes final comments from Harijot 3/23/04)



EXHIBIT A
PAGE 10

exceptions made to an award submitted to it for confirmation as a judgment (with respect to attorney fees incurred in such court proceedings).

20.     **Notice and Payments.** All notices, bills and payments shall be made in writing and may be given by personal delivery or by first class, registered or certified mail. Notices, bills and payments sent by mail must be addressed as follows:

Licensor:

        Harbhajan Singh Khalsa Yogiji and
        Inderjit Kaur Living Trust
        PO Box 351149
        Los Angeles, CA  90035

Licensee:

        Golden Temple of Oregon, Inc.
        2545- D Prairie Road
        Eugene, OR   97402
        Attn: Kartar Singh Khalsa

Harbhajan Singh Khalsa
      Yogiji:

        PO Box 351149
        Los Angeles, California 90035

and when so addressed shall be deemed given 48 hours after deposited in the U.S. mail, postage prepaid, and postmarked. In all other instances notices, bills, and payments shall be deemed given at the time of actual delivery. Changes may be made in the names and addresses of the person to whom notices, bills, and payments are to be given by giving notice pursuant to this Section.

21.     **Merger -- Complete Agreement.** This Agreement constitutes the entire agreement between the parties. There are no understandings, agreements or representations, oral or written, not specified herein regarding this Agreement. Any and all prior agreements or representations respecting the subject matter hereof, whether written or oral, expressed or implied, are hereby terminated and of no further effect. No amendment, consent, or waiver of terms of this Agreement shall bind either party unless in writing and signed by both parties. Any such amendment, consent, or waiver shall be effective only in the specific instance and for the specific purpose given. The parties, by their signatures below, acknowledge having read and understood the Agreement and agree to be bound by its terms and conditions.

      IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized agents effective as of the date and year first above written.

**Golden Temple of Oregon, Inc.**          **Harbhajan Singh Khalsa Yogiji and Inderjit Kaur Living Trust**

By: _____          By: _____
Its: _____          Harbhajan Singh Khalsa Yogiji, Trustee

9 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT (includes final comments from
      Harijot 3/23/04)
PDX/032833/082268/RDL/Comparite of 1123208 v5 and v7

EXHIBIT A

PAGE 11

_____
Harbhajan Singh Khalsa Yogiji

Attachments:

Exhibit 1.4 – Licensed Trademarks
Exhibit 1.5 – Licensed Products
Exhibit 6.1 – Royalty Rates
Exhibit 14.3 – Promissory Note

STATE OF NEW MEXICO
COUNTY OF SANTA FE

Signed in my presence by
HARBHAJAN Singh Khalsa Yogiji on
October 1, 2004.

NOTARY
comm. exp 10/12/04

10 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT (includes final comments
from Harijot 3/23/04)
PDX/032833/082268/RDL/Comparite of 1123208 v5 and v7

EXHIBIT A
PAGE 12

Exhibit 1.4
1 of 2



# Yogi Bhajan
# Founder

Exhibit 1.4
2 of 2



– Yogi
Bhajan

(Bow again to
color image)

EXHIBIT A
PAGE 14

Exhibit 1.5

| Cereal | |
|---|---|
| **WHA GURU CHEW** | |
| 500101-02 | Peanut Cashew |
| 500102-02 | Sesame Almond |
| 500103-02 | Cashew Almond |
| 511113-02 | Cashew Vanilla |
| 511114-02 | Almond Ginger |
| | |
| **PILLOW PACK** | |
| 100512-02 | Super Nutty |
| 100511-02 | Crisp & Crunchy |
| 100510-02 | Wild Blueberry |
| 131122-02 | NFA Strawberry |
| 100602-02 | LF Fruit Muesli |
| | |
| **PEACE CEREAL** | |
| 138003-02 | Apple Cinnamon Crisp |
| 138004-02 | Raspberry Ginger Crisp |
| 138005-02 | Vanilla Almond Crisp |
| 138006-02 | Maple Raisin Crisp |
| 138007-02 | Wild Berry Crisp |
| 138008-02 | Mango Passion Crisp |
| 138009-02 | Maple Pecan Crisp |
| 191101-02 | Rainforest Vanilla Nut |
| 191102-02 | Rainforest Banana Nut |
| 138013-02 | Hearty Raisin Bran |
| 138011-02 | Puffed Harvest |
| 138014-02 | Essential 10 |
| | |
| **BULK** | |
| 141550-03 | LF Apple Cinnamon |
| 141551-03 | LF Raisin Almond |
| 141552-03 | LF Straw/Raspberry |
| 141531-03 | Organic Mango Passion |
| 141510-03 | Coconut Almond |
| 141512-03 | Fruit 'N Nut |
| 141522-03 | Wild Blueberry |
| 141513-03 | Cinn-Apple-Raisin |
| 141514-03 | Maple Almond |
| 141520-03 | Super Nutty |
| 141538-03 | Crisp & Crunchy |
| 141541-03 | Cranberry Orange Crunch |
| 141542-03 | Berry Banana Burst |
| 141543-03 | Maple Pecan Dream |
| 141544-03 | Country Pumpkin Spice |
| 141525-03 | French Vanilla Almond |
| 141526-03 | Power Crunch |
| 191430-03 | Rainforest Bulk |
| 141571-03 | 35% Fruit Muesli |
| 141572-03 | Lite Muesli |

| 141573-03 | Swiss Style Muesli |
| 141527-03 | Ginger Snap |
| 141574-03 | Cherry Vanilla |
| 141586-03 | Vanilla Macaroon |

**Tea**

**WELLNESS TEAS**

| 245001-02 | BEDTIME |
| 245004-02 | BREATHE DEEP |
| 245002-02 | CALMING TEA |
| 245009-02 | WINTER RELIEF |
| 245008-02 | DETOX |
| 245010-02 | ECH. IMMUNE SUPPORT |
| 245014-02 | FASTING |
| 245012-02 | GET REGULAR |
| 245011-02 | GINGER |
| 245025-02 | GINKGO IQ |
| 245007-02 | GINSENG ROYAL VITALITY |
| 245033-02 | JOINT COMFORT TEA |
| 245030-02 | KAVA STRESS RELIEF |
| 245017-02 | LEMON GINGER |
| 245023-02 | PEACH DETOX |
| 245024-02 | RASPBERRY GINGER |
| 245032-02 | ST JOHNS WORT |
| 245003-02 | STOMACH EASE |
| 245018-02 | THROAT COMFORT |
| 245015-02 | WOMAN'S MOON CYCL |
| 245005-02 | WOMAN'S DONG QUAI |
| 245043-02 | RASPBERRY LEAF |
| 245044-02 | MOTHER TO BE |
| 245045-02 | NURSING MOM |

**GREEN TEAS**

| 245028-02 | GREEN TEA REJUVINATION |
| 245021-02 | GRN TEA KOMBUCHA |
| 245037-02 | GREEN TEA DECAF |
| 245027-02 | GREEN TEA ENERGY |
| 245036-02 | GT SUPER ANIT-OX |
| 245026-02 | GREEN TEA TRIPLE ECHIN. |

**CHAI TEAS**

| 241531-02 | BLACK CHAI TEA |
| 241532-02 | GREEN CHAI TEA |
| 241533-02 | REDBUSH CHAI TEA |

**BULK TEAS**

| 241001-16 | CIN SPICE C&S 3OZ CTN |
| 241530-11 | CIN-SPICE C&S  1 LB |

SIMPLY GREEN TEAS                          Page 1

EXHIBIT
PAGE   16

| | |
|---|---|
| 245040-02 | SIMPLY GREEN TEA MATE |
| 245041-02 | SIMPLY DECAF GREEN TEA |
| 245042-02 | SIMPLY GREEN TEA |
| | |
| **BEVERAGE TEAS** | |
| 241514-02 | CLASSIC INDIA SPICE TEA |
| 241516-02 | EGYPTIAN LICORICE TEA |
| 241521-02 | HIBISCUS PARADISE TEA |
| 241523-02 | DECAFFE ROAST TEA |
| 241524-02 | ANDES YERBA MATE |
| 241525-02 | VANILLA HAZELNUT |
| 241526-02 | COCOA SPICE TEA |
| 241527-02 | EGYPTIAN LICORICE MINT |
| 241528-02 | AFRICAN REDBUSH PEACH |
| | |
| Tea Concentrates | |
| 245501-03 | CLSIC INDIA SPICE TEA LATTE |
| 245502-03 | VANILLA HZELNT TEA LATTE |
| | |
| | |
| SUNSHINE SPA | |
| Perfume Oils | |
| 369514-01 | Arabian Musk |
| 369534-01 | Gardenia |
| 369544-01 | Honeysuckle |
| 369554-01 | Jasmine |
| 369564-01 | Jasmine & Rose |
| 369594-01 | Musk |
| 301404-01 | Omar |
| 301414-01 | Patchouli |
| 301424-01 | Rose |
| 301464-01 | Wood Spice |
| 369586-01 | Lavender |
| 369590-01 | Vanilla |
| 369587-01 | Mango |
| 369588-01 | Sensuality |
| 369589-01 | Tangerine |
| 369585-01 | Cucumber Melon |
| | |
| BODY OILS | |
| 311208-08 | Pure Almond |
| 311209-08 | Vanilla |
| 311213-08 | Lavender |
| 311212-08 | Sandalwood |
| 311214-08 | Muscle Comfort |
| 311215-08 | Rest & Relax |
| | |
| Salt Scrubs | |
| 312002-20 | Lavender |
| 312003-20 | Pprmnt-Rsmry |

EXHIBIT A
PAGE 17

| 312001-20 | Vanilla |
|-----------|---------|
| 312004-20 | Tangerine Salt Scrubs |
| | |
| Sugar Scrubs | |
| 312005-20 | Vanilla Orange Scrubs |
| 312006-20 | Mango Ginger Scrubs |
| | |
| Body Butters | |
| 312127-07 | Cucumber Melon |
| 312128-07 | Lavender |
| 312129-07 | Mango |
| 312126-07 | Vanilla Orange |
| | |
| Herbal Therapy Oils | |
| 311901-02 | Narayan Oil |
| 311902-02 | Spirit Of GRD |
| 311903-02 | Espirit De Cupid |
| | |
| Herbal Gems | |
| 651001-01 | Royal Vitality - 1R |
| 651002-01 | Digest Rite - 2R |
| 651003-01 | Trinity Root - 3R |
| 651004-01 | Relax and Relieve - 7R |
| 651005-01 | Male Treasures - 14R |
| 651006-01 | Energy Tresures - 42R |
| 651007-01 | Cold Comfort - 96R |
| 651008-01 | Royal Heart - 108R |
| 651009-01 | Joint Comfort |
| 651010-01 | Women's Treasures |
| 651011-01 | Joyful Mood |
| 651012-01 | Immune Gold |
| 651013-01 | Sleep Rite PM |
| 651014-01 | Royal Slender |
| 651015-01 | Brain Plus |
| 651016-01 | Great Royal Diet |

EXHIBIT A
PAGE 18

**Exhibit 6.1**

<u>Royalty Rates</u>

<u>For Annual Gross Sales during each calendar year:</u>

| | | |
|---|---|---|
| Up to | $25,000,000 | 3.5% |
| In excess of up to | $25,000,000 $50,000,000 | 0.50% |
| In excess of up to | $50,000,000 $100,000,000 | 0.25% |
| In excess of | $100,000,000 | 0.10% |

Exhibit 14.3 to Nonexclusive Trademark License Agreement

## PROMISSORY NOTE

$1,500,000                                              _____ 6, 2004
                                                       Espanola, New Mexico

     FOR VALUE RECEIVED, the undersigned maker ("Maker") promises to pay to the order of Harbhajan Singh Khalsa Yogiji, Trustee of the Harbhajan Singh Khalsa Yogiji and Inderjit Kaur Living Trust ("Holder"), at the address specified below, or at such other place as Holder may designate, on or before the maturity date specified herein, the principal sum of ONE MILLION FIVE HUNDRED THOUSAND AND NO/100 ($1,500,000.00) DOLLARS as provided herein.

1.    Interest and Payment.

    1.1    Interest Rate. The unpaid principal will bear interest at the rate of three and eight tenths percent (3.8%) per annum. From and after a default, the unpaid principal will bear interest at the rate of fifteen percent (15%) per annum, or the highest rate allowed under applicable law, whichever is lowest.

    1.2    Payments. The principal balance and accrued interest thereon shall be paid in 54 monthly installments of Thirty Thousand Dollars ($30,000) each, including both principal and accrued interest, commencing September 1, 2004. The entire principal balance and accrued interest thereon shall be due and payable on February 1, 2009 (the "Maturity Date").

    Each payment of this Note shall be applied first against accrued interest, with the remainder applied against the unpaid principal balance. If Maker fails to make any payment required by this Note within fifteen (15) days after the payment is due, a late charge equal to five percent (5%) of the payment will be added to the unpaid principal amount and be immediately due.

    1.3    Place and Time of Payment. Payment shall be made to the Holder at the address set forth below, and shall be made without prior notice or demand.

        Harbhajan Singh Khalsa Yogiji, Trustee.
        PO Box 351149
        Los Angeles, California 90035

    Holder may change the payee or address to which payments must be sent by notice to Maker of Holder's new address or of the name and address of a collection agent for Holder to which subsequent payments will be delivered.

EXHIBIT A
PAGE 20

Holder may freely assign its entire interest in this Promissory Note. An assignment of Holder's entire interest in this Promissory Note is not effective until Holder notifies Maker of such assignment, with such notice executed by Holder.

    1.4    <u>Discretionary Prepayment</u>.  Maker shall have the right to prepay all or any portion of the debt evidenced hereby without the written consent of Holder; provided however that Maker pays to Holder at the time of such prepayment, in addition to the prepayment of principal, an amount equal to the smaller of (1) Fifty Thousand Dollars ($50,000), or (2) fifty percent (50%) of the amount of interest which would have accrued on the prepaid principal through the Maturity Date were no prepayment made.

2.    <u>Security</u>.  This Note is unsecured.

3.    <u>Default</u>.  Time is of the essence of this Note.  A default shall occur if:

    3.1    <u>Failure to Make Payment</u>.  Maker fails to make payment under this Promissory Note within ten (10) days after notice to Maker of such failure.

    3.2    <u>Other Failures</u>.  Maker fails to perform any other obligation contained in this Promissory Note or any document securing payment hereof within fifteen (15) days after notice from Holder specifying the nature of the default, or, if such default is not capable of being cured within fifteen (15) days, then Maker shall not be in default so long as Maker commences cure of the applicable default within such fifteen (15) day period and diligently and continuously prosecutes such cure to completion.

    3.3    <u>Bankruptcy</u>.  Maker becomes insolvent, a receiver is appointed to take possession of all or a substantial part of Maker's properties, Maker makes an assignment for the benefit of creditors or files a voluntary petition in bankruptcy, or Maker is the subject of an involuntary petition in bankruptcy and such involuntary petition is not dismissed within one hundred twenty (120) days of filing.

4.    <u>Remedies</u>.  In the event of a default, Holder may take any one or more of the following steps, subject to the limitations specified in section 3.2:

    (a)    <u>Acceleration</u>.  Declare the entire unpaid principal balance, all accrued interest and all interest to subsequently accrue under this Promissory Note and all other costs and expenses evidenced hereby, immediately due and payable.

    (b)    <u>Other Remedies</u>.  Pursue any other right or remedy provided herein or otherwise allowed by law.

Holder may pursue any such rights or remedies singly, together or successively.  Failure to exercise any right or remedy shall not be deemed a waiver of any existing or subsequent default nor a waiver of any such right or remedy.

EXHIBIT A
PAGE 21

5.    Attorneys' Fees.  In the event litigation or arbitration is commenced by a party hereto to enforce or interpret any provision of this Note, or to collect any amount due hereunder, the prevailing party in such litigation or arbitration shall be entitled to receive, in addition to all other sums and relief, its reasonable costs and attorneys', paralegals', accountants', and other experts' and professional fees, incurred both at and in preparation for trial and any appeal or review, such amount to be set by the courts or arbitrator before which the matter is heard. Maker also agrees to pay any attorneys', paralegal', accountants', and other experts' and professional fees incurred by Holder in connection with any bankruptcy or similar proceedings wherein the Maker is the "debtor," including, but not limited to, issues peculiar to federal bankruptcy law.

6.    Governing Law, Usury; Severability.

6.1    Governing Law and Usury.  This Promissory Note has been executed under and shall be construed and enforced in accordance with the laws of the State of Oregon. It is expressly stipulated and agreed to be the intent of Maker and Holder at all times to comply strictly with the applicable usury laws now or hereafter governing consideration received under this Promissory Note. If the applicable law is ever interpreted so as to render usurious any consideration called for, contracted for, charged, taken, reserved or received with respect to this Promissory Note, or if any prepayment by Maker or Holder's exercise of the option herein contained to accelerate the maturity of this Promissory Note, results in Maker having paid any interest in excess of that permitted by law, then notwithstanding anything to the contrary in this Promissory Note, it is Maker's and Holder's express intent and agreement that all excess amounts theretofore collected by Holder be credited on the principal balance of this Promissory Note (or, if this Promissory Note has been paid in full, refunded to Maker) and the provisions of this Promissory Note shall immediately be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new documents, so as to comply with the then applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

6.2    Severability.  If any provision of this Promissory Note is found by a court of competent jurisdiction to be invalid or unenforceable as written, then the parties intend and desire that (a) such provision be enforceable to the full extent permitted by law, and (b) the invalidity or unenforceability of such provision shall not affect the validity and enforceability of the remainder of this Promissory Note.

7.    Amendment.  This Promissory Note may not be amended, modified or changed, nor shall any provision hereof be deemed waived, except only by an instrument in writing signed by the party against whom enforcement of any such waiver, amendment, change, or modification is sought.

8.    Notice.  All notices, consents, waivers, and other communications under this Promissory Note must be in writing and will be deemed to have been duly given when (a) delivered by hand; (b) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), or (c) when received by the addressee if mailed by registered mail, return



EXHIBIT A
PAGE 22

receipt requested, in each case to the appropriate addresses set forth below (or to such other addresses as either Holder or Maker may designate by notice to the other):

Maker:           Golden Temple of Oregon, Inc.,
                     2545-D Prairie Road
                     Eugene, Oregon 97402

Holder:         Harbhajan Singh Khalsa Yogiji, Trustee of the Harbhajan
                     Singh Khalsa and Inderjit Kaur Living Trust.
                     PO Box 351149
                     Los Angeles, California 90035

9.      <u>Time of Essence</u>.  Time is of the essence of this Promissory Note.

Executed as of the day and year first above written.

MAKER:

GOLDEN TEMPLE OF OREGON, INC.

By: _____
Its: _____

EXHIBIT A
PAGE 23

# **EXHIBIT B**

## NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT

This Nonexclusive Trademark License Agreement (the "Agreement") is made effective as of this 26 day of ___July___, 2004, among Harbhajan Singh Khalsa Yogiji, Trustee of the Harbhajan Singh Khalsa Yogiji and Inderjit Kaur Living Trust (the "Licensor"), Golden Temple of Oregon, Inc., an Oregon corporation ("Licensee") and, as to Section 15, Harbhajan Singh Khalsa Yogiji, individually.  Licensor and Licensee are sometimes referred to as the Parties to this Agreement.

### RECITALS

A.     Licensor and Licensee have previously concluded several licensing agreements, each of which is terminated by this Agreement, with this Agreement to be a full and complete substitute for all prior licensing agreements between the Parties.

B.     The terms of this Agreement reflect the desire of Licensor to maintain the existing level of royalty income and the desire of Licensee to pay reduced royalty rates for increasing levels of its Gross Sales.

In consideration of the mutual covenants and undertakings set forth below, it is agreed as follows:

1.     **Definitions.**

1.1     The term "**Confidential Information**" shall mean this Agreement and all confidential or otherwise proprietary business and technical information relating to the Parties and their respective business plans as well as any intellectual property disclosed by either Party under this Agreement. Confidential Information includes, but shall not be limited to, ideas, inventions, discoveries, improvements, know-how, trade secrets, drawings, blue-prints, long-range and short-range plans, production, manufacturing and sales techniques, financial statements and data, information, recipes, formulas, sources of supply, advertising, actual and prospective customers, pricing, costing, and accounting procedures.  Notwithstanding the foregoing, Confidential Information shall not include information that:

    (a)    is in the public domain at the time of disclosure by the disclosing Party;

    (b)    enters the public domain after disclosure by the disclosing Party through no fault of the receiving Party;

    (c)    was or is separately disclosed to the receiving Party by a third party not itself subject to an obligation of confidentiality to the disclosing Party with respect to such information;

    (d)    was in the receiving Party's possession at the time of disclosure by the disclosing Party; or

1 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT

EXHIBIT B
PAGE 24



(e)     was independently developed by the receiving Party without any use of the disclosing Party's Confidential Information.

1.2     The term "**HSKY Marks**" and "**Marks**" shall mean any trademark, servicemark, logo, insignia, seal, design, or other symbol or device used by or identifying Harbhajan Singh Khalsa Yogiji (also known as Yogi Bhajan), specifically including the name of Harbhajan Singh Khalsa Yogiji, or Yogi Bhajan, any likeness of him approved in accordance with this Agreement, and a facsimile of his signature confirming any statement of 150 words or less (approved in accordance with this Agreement) as his statement.

1.3     The term "**Gross Sales**" shall mean the total dollar amount of gross sales of Licensed Products by Licensee, after deducting any credits for returns actually made or allowed (as supported by credit memoranda actually issued to customers). The gross sale price of all Licensed Products must be reasonably determined by Licensee and must reflect any commercially reasonable price reduction, clearance sale pricing and other marketing discounts. Gross Sales resulting from sales to any party directly or indirectly related to or affiliated with Licensee shall be computed based on regular selling prices to the trade. No other costs incurred in the manufacturing, selling, advertising, and distribution of the Licensed Products shall be deducted in calculating Gross Sales, nor shall any deduction be allowed for any uncollectible accounts or allowances.

1.4     The term "**Licensed Trademarks**" shall mean the Marks as defined in Section 1.2 and listed on the attached <u>Exhibit 1.4</u>, which Exhibit may be amended from time to time by mutual agreement of the parties.

1.5     The term "**Licensed Products**" shall mean any product or part thereof bearing a Licensed Trademark and listed on the attached <u>Exhibit 1.5</u>, which Exhibit may be amended from time to time by mutual agreement of the parties.

2.     **Grant of License.**

2.1     Until terminated, as provided herein, Licensor hereby grants Licensee (1) an exclusive license to use Licensed Trademarks on Licensed Products anywhere in the world and (2) a non-exclusive license to manufacture, sell and distribute tea and chai Licensed Products in North America, central America, South America, Russia, and Australia and all other Licensed Products anywhere in the world, each in accordance with the terms of this Agreement.

2.2     No right is granted to Licensee to sublicense or otherwise transfer the right to use the Licensed Trademarks to third parties. No license is granted to Licensee hereunder for the manufacture, sales or distribution of Licensed Products to be used as premiums, for publicity purposes, for fund-raising, as giveaways, in combination sales, or to be disposed of under similar methods of merchandising. Licensee may not use any Licensed Trademarks in connection with any sweepstakes, lottery, game of chance, or similar promotional or sales device, scheme, or program.

3.     **KRI Approval.**

2 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT

EXHIBIT B
PAGE 25

3.1    Each likeness of Yogi Bhajan must be approved in writing by Kundalini Research Institute ("KRI"), a California nonprofit corporation, for its consistency with the maintenance of the dignity of the teachings of Yogi Bhajan.

3.2    Each statement of 150 words or less must be verified for accuracy by KRI, with such verification to be confirmed in writing by KRI before any use of the statement by Licensee.

3.3    Any use of Yogi Bhajan copyrighted yogic or meditation technology must be verified for accuracy by KRI, with such verification to be confirmed in writing by KRI before any use of such technology by Licensee. Each use of Yogi Bhajan copyrighted yogic or meditation technology by Licensee must be accompanied by a copyright mark.

3.4    No Yogi Bhajan likeness, statement of 150 words or less, or Yogi Bhajan copyrighted yogic or meditation technology will be regarded as approved by KRI notwithstanding Licensee's receipt of a written statement from KRI confirming such approval, until Licensee has paid to KRI the fee invoiced to Licensee by KRI for its review and approval service.

4.    **Quality Assurance.**

4.1    To assure Licensor that its Licensed Products are comparable or better in quality to the other saleable merchandise in the Territory, Licensee agrees to submit, at Licensee's expense, samples of all proposed Licensed Products, including material modifications to such Licensed Products, to Licensor prior to any use, sale or other distribution to the public. Licensee agrees to withhold any use, sale or other distribution of such proposed Licensed Products until it receives written approval by Licensor. Licensor may withhold approval of proposed Licensed Products for any reason. Licensor agrees to promptly and reasonably respond to all such submissions.

4.2    Licensee agrees to maintain such reasonable manufacturing, servicing and quality standards as may from time to time be requested by Licensor. Licensee shall assure Licensor that Licensed Products manufactured and/or sold by it meet or exceed the quality and specifications of the samples approved by Licensor.

5.    **Trademark Use and Ownership.**

5.1    Licensee agrees to submit to Licensor copies of any packaging, advertisements or promotional materials containing Licensed Trademarks for Licensor's approval prior to any use thereof. Licensee agrees to remove any material which is objectionable to Licensor.

Licensor may withhold approval of any packaging, advertisements or promotional materials containing Licensed Trademarks for any reason. Licensor's approval in accordance with this Section 5.1 must be in writing with the following exceptions:

(a)    Licensor will be deemed to have approved any proposed use of a Licensed Trademark for a Licensed Product if that Licensed Trademark was previously approved for use

3 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT

for a different Licensed Product unless Licensor disapproves such use within thirty (30) days after approval is requested by Licensee in writing.

(b)     Licensor will be deemed to have approved any proposed use of a Licensed Trademark for a Licensed Product unless Licensor disapproves such use within sixty (60) days after approval is requested by Licensee in writing.

5.2     Licensee acknowledges Licensor's exclusive rights in and to the Licensed Trademarks, that the Licensed Trademarks are unique and original to Licensor and that Licensor is the owner thereof. Licensee agrees that it will not, during the term of this agreement or thereafter, challenge, dispute or contest, directly or indirectly, Licensor's exclusive right and title to the Licensed Trademarks or the validity thereof. Licensee agrees that it shall not apply for registration or otherwise seek to obtain ownership of any Licensed Trademarks, or any mark confusingly similar to any Licensed Trademarks, in any country.

5.3     Licensee agrees that its use of the Licensed Trademarks inures to the benefit of Licensor and that Licensee shall not acquire any rights in the Licensed Trademarks. Licensee acknowledges the good will associated with the Licensed Trademarks and that all rights therein belong exclusively to Licensor.

6.      **Rights Fee and Royalties.**

6.1     Licensee agrees to pay Licensor a royalty equal to Gross Sales for all Licensed Products sold by Licensee. The applicable royalty rate for each transaction yielding Gross Sales is specified on Exhibit 6.1 attached. Royalty payments shall be made monthly, and not later than fifteen (15) days following the end of each calendar month. All royalties shall be paid in U.S. dollars to Licensor at its address set forth in Section 17.

6.2     A royalty obligation shall accrue upon the sale of the Licensed Products regardless of the time of collection by Licensee. A Licensed Product shall be considered "sold" upon the date when such Licensed Product is billed, invoiced, shipped or paid for, whichever event occurs first.

6.3     Upon termination of this Agreement, all royalty obligations shall be accelerated and shall immediately become due and payable.

6.4     Licensee's obligations for the payment of a royalty shall survive termination of this Agreement and will continue for so long as Licensee continues to manufacture, sell or otherwise market the Licensed Products.

6.5     If the Licensee elects to extend the term of this Agreement in accordance with Section 9.1, the royalty rate specified on Exhibit 6.1 must be adjusted for Gross Sales during the extended term of the Agreement. The adjusted royalty rate will be as agreed by the Parties. If the Parties cannot agree on an adjusted royalty rate within thirty (30) days after the Licensee's election to extend the term of this Agreement, the royalty rate must be determined by appraisal of an accredited senior appraiser with the American Society of Appraisers acceptable to both Parties. If the Parties cannot agree on an appraiser, the appraiser shall be designated by the

4 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT



EXHIBIT B
PAGE 27

presiding judge of the court of general jurisdiction located in the county in which is located the Licensee's principal place of business. The appraiser to be so designated must be an accredited senior appraiser with the American Society of Appraisers.

7.    **Accounting and Reporting.**

7.1    Licensee shall submit to Licensor monthly reports of all its Gross Sales of Licensed Products. These reports shall itemize all sales of Licensed Products by units, dollars, and product category and style. The receipt or acceptance by Licensor of any royalty statement, or the receipt or acceptance of any royalty payment made, shall not prevent Licensor from subsequently challenging the validity or accuracy of such statement or payment.

7.2    Licensee shall keep account books, records and duplicates of all invoices to customers showing the manufacture and sales or other distribution of Licensed Products. The books, records and invoices shall be maintained for a period of at least five (5) years after the payment of the corresponding royalty and shall be available for inspection and copying by duly authorized representatives of Licensor during regular business hours upon reasonable notice. Licensee shall cooperate fully with Licensor in making the inspection.

7.3    Once during each year in which this Agreement is in effect, and once after termination of this Agreement, Licensor shall be entitled to an independent audit of Licensee's account books, records, invoices and other pertinent data. The audit shall be conducted at Licensee's place of business during normal business hours. In the event that such inspection reveals a discrepancy in the amount of royalty owed Licensor from what was actually paid, Licensee shall immediately pay such discrepancy, plus interest calculated at the rate of one and one-half percent (1.50%) per month. The cost of the audit will be paid by Licensor unless the audit shows that Licensee understated sales of Licensed Products by more than five percent (5%), in which case Licensee shall pay Licensor's costs of the audit, including all professional fees incurred.

7.4    The requirements of this Section 7 shall survive termination of this Agreement.

8.    **Confidentiality.**  Each Party agrees to maintain in strict confidence and, except to the extent expressly permitted in this Agreement or otherwise consented to in writing by the other Party, not to use any Confidential Information received from the other Party except in connection with this Agreement. Each Party agrees to use reasonable efforts to protect the confidentiality of any Confidential Information received from the other Party and to prevent third party access to any documents or other items containing Confidential Information received from the other Party. Each Party agrees to treat the other's Confidential Information with the same degree of confidentiality and care as it treats its own Confidential Information, which shall be no less than reasonable care. The obligations of confidentiality and non-use contained in this Agreement will remain in effect perpetually, surviving any expiration or termination of this Agreement. Nothing in this Agreement shall modify or limit the confidentiality obligations of either Party arising under any other agreement.

9.    **Duration and Termination.**

5 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT (

EXHIBIT B
PAGE 28

9.1     **Duration.**  The present Agreement is concluded for a period of ten (10) years, subject to Licensee's right to elect to extend the term of this Agreement for an additional ten (10) years by notice to Licensor of such election.  The Licensee's election must be provided no earlier than one year, and no later than 90 days, prior to the end of the then term of this Agreement.  In the event that Licensee elects to extend the term of this Agreement, all of the terms and conditions of this Agreement (including Licensee's right to elect to further extend the term of this Agreement in accordance with this Section 9.1) shall apply during the term as so extended and the royalty rate specified on Exhibit 6.1 attached must be adjusted in accordance with Section 6.1.

9.2     **Termination upon Default.**  At any time during the term of this Agreement, either Party may terminate this Agreement upon sixty (60) days' written notice to the other Party if the other Party is in material breach in the performance of any of its obligations hereunder and (i) fails to cure the breach within sixty (60) days after receiving written notice of it, or (ii) if more than sixty (60) days is reasonably required to cure such breach, fails to commence in good faith and diligently to cure such breach within said sixty (60) day period.

9.3     **Termination by Agreement.**  The Parties may terminate this Agreement at any time by mutual written agreement.

9.4     **Effect of Bankruptcy or Insolvency.**  Licensor may terminate this Agreement in the event:  (a) Licensee has ceased its business activities or has otherwise begun winding up its business affairs; (b) bankruptcy, reorganization, arrangement, or insolvency proceedings or other proceedings for relief under any bankruptcy or similar law or laws for the relief of debtors, are instituted by or against Licensee and are not dismissed within one hundred twenty (120) days; (c) a custodian, liquidator, receiver, or trustee is appointed for Licensee or the major part of its property; or (d) Licensee becomes insolvent or bankrupt, makes an assignment for the benefit of its creditors or makes any comparable arrangement with its creditors.

9.5     **Effect of Termination or Expiration.**  Subject to the terms of this Section 9.5, termination of this Agreement by Licensor upon default by Licensee shall terminate all rights and licenses granted to Licensee under this Agreement, and Licensee agrees to cease its use, purchase, production and sale of the Licensed Products.  Notwithstanding the foregoing, in the event of termination for default, Licensee shall have a limited license to continue to supply Licensed Products to customers from whom Licensee has received orders prior to Licensee's receipt of the notice of termination for a period of one (1) year from the date of termination, so long as Licensee continues to satisfy its royalty obligations under this Agreement.

9.6     **Equitable Remedies.**  Licensee acknowledges that money damages alone are inadequate to compensate Licensor for any breach by Licensee of the Agreement.  Therefore, in the event of a breach or threatened breach of any provision of the Agreement by Licensee, Licensor may, in addition to all other remedies, immediately obtain and enforce injunctive relief prohibiting the breach or compelling specific performance.

10.     **Notice of Infringement.**  Licensee agrees to notify Licensor promptly of any known use of Licensed Trademarks by others not duly authorized by Licensor.  No action, other than the

6 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT

EXHIBIT B
PAGE 29

above notification to Licensor, shall be taken by the Licensee for enforcement of any Licensed Trademarks subject to this Agreement.

11.     **Indemnification.** Licensee shall indemnify, defend, and hold harmless Licensor, and its trustees, officers, directors, employees and agents from and against any and all claims, demands, damages, liabilities or judgments arising out of or in connection with Licensee's performance of this Agreement or Licensee's exercise of the license granted by this Agreement, including but not limited to any and all liability caused by or arising from the suitability for use or merchantability of any item manufactured or sold pursuant to this Agreement or the use of any Licensed Trademark pursuant to this Agreement.

12.     **Insurance.**

        12.1     During the term of this Agreement, Licensee shall maintain in effect insurance in the combined amount of $1,000,000 per occurrence for bodily injury and property damage against claims, demands, or causes of action or damages, including reasonable attorney's fees, arising out of any alleged defects in the Licensed Products or in the use thereof. The insurance policy(ies) shall include an endorsement naming Licensor as an additional insured insofar as this Agreement is concerned, and provide that notice shall be given to Licensor at least 30 days prior to cancellation or material change in the form or substance of such policy(ies).

        12.2     Licensee shall promptly furnish Licensor with appropriate certificate(s) of insurance together with the endorsement(s) required herein. Licensee shall not commence performance under this Agreement until certificate(s) of insurance and endorsement are submitted. Licensee shall annually furnish Licensor, on the anniversary of this Agreement, appropriate certificate(s) of insurance and endorsement.

13.     **Termination of Prior Agreements.** All prior licensing agreements between Licensor and Licensee are hereby terminated.

14.     **Grant of Recipe/Formula License.**

        14.1     **License.** Licensor hereby grants to Licensee the exclusive and perpetual license in the Exclusive Territory to develop, make, use, sell and offer for sale Products to the Licensed Market, and to incorporate into marketing and packaging of each Product words (but in no event more than 25 words) which communicate that the Product was developed or formulated by Yogi Bhajan for Yogic and Ayurvedic processes.

        14.2     **Definitions.** For purposes of this Section 14, the following terms have the definitions specified below.

                (a)     "**Exclusive Territory**" means with respect to tea and chai Products, North America, Central America, South America, Russia and Australia; and with respect to all other products, the world.

                (b)     "**Licensed Market**" means the food, body care and health products market.

7 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT

EXHIBIT B
PAGE 30

(c)   "Product" means any food, body care or health product using any recipe or formulae previously developed by Yogi Bhajan or treated by Licensor and Licensee as so developed under a prior licensing agreement.

14.3   **Payment for License.** In consideration for the license granted in Section 14.1, Licensee will execute and deliver to Licensor that promissory note attached as **Exhibit 14.3.** This promissory note must be executed and delivered simultaneously with execution of this Agreement.

15.   **New Recipes/Formulae.**

15.1   **New Recipes/Formulae.** Harbhajan Singh Khalsa Yogiji hereby acknowledges and agrees that (1) each recipe or formula he may develop subsequent to the effective date of this Agreement for any Product is to be licensed in accordance with Section 14.1; and (2) he will not develop any recipe or formula for any product other than a food, body care or health product without first granting to Licensee the first right to purchase such recipe or formula or license sales of such product, with Licensee to have sixty (60) days in which to exercise such right, and with Harbhajan Singh Khalsa Yogiji prohibited from selling the recipe or formula or licensing sales of such product at a price or on terms more favorable to the purchaser or licensee than the terms first offered to Licensee.

15.2   **Consideration.** In consideration of the obligations of Harbhajan Singh Khalsa Yogiji under Section 15.1, Licensee agrees to pay to Harbhajan Singh Khalsa Yogiji the sum of Two Thousand Five Hundred Dollars ($2,500.00) per month. Licensee's obligation to make these monthly payments will terminate at the death of Harbhajan Singh Khalsa Yogiji.

16.   **Modifications and Waiver.**

16.1   This Agreement shall not be amended or modified except in a writing signed by each party affected by the agreement or modification.

16.2   No waiver by either Party of any breach or default of any of the provisions of this Agreement shall be deemed a waiver as to any subsequent and/or similar breach of default.

17.   **No Joint Venture.** Nothing contained herein shall constitute this arrangement to be that of employment, joint venture or partnership.

18.   **Assignability.** This Agreement shall inure to the benefit of Licensor, its successors and assigns, but will be personal to Licensee and shall be assignable by Licensee only with the prior written consent of Licensor.

19.   **Dispute Resolution; Attorney Fees.** Any controversy or claim arising out of, or relating to, this Agreement, or the making, performance, or interpretation of this Agreement, shall be settled by arbitration in Portland, Oregon, in accordance with the rules and procedures of Arbitration Services of Portland, Inc., or if that organization is not then in existence, in accordance with the provisions of ORS 33.210-33.250. Judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy. The

8 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT

EXHIBIT B
PAGE 31

prevailing party in the arbitration shall be entitled to its reasonable costs and attorney fees in connection therewith. The determination of who is the prevailing party, what are reasonable costs, and the amount of attorney fees to be paid to the prevailing party shall be decided by the arbitrator(s) (with respect to all recoverable attorney fees incurred prior to and during the arbitration proceedings) and by the court or courts, including any appellate court, that hears any exceptions made to an award submitted to it for confirmation as a judgment (with respect to attorney fees incurred in such court proceedings).

20.     **Notice and Payments.** All notices, bills and payments shall be made in writing and may be given by personal delivery or by first class, registered or certified mail. Notices, bills and payments sent by mail must be addressed as follows:

Licensor:                       Harbhajan Singh Khalsa Yogiji and
                                Inderjit Kaur Living Trust
                                PO Box 351149
                                Los Angeles, CA  90035

Licensee:                       Golden Temple of Oregon, Inc.
                                2545-D Prairie Road
                                Eugene, OR  97402
                                Attn: Kartar Singh Khalsa

Harbhajan Singh Khalsa
    Yogiji:                     P.O.Box 351149
                                Los Angeles, CA 90035

and when so addressed shall be deemed given 48 hours after deposited in the U.S. mail, postage prepaid, and postmarked. In all other instances notices, bills, and payments shall be deemed given at the time of actual delivery. Changes may be made in the names and addresses of the person to whom notices, bills, and payments are to be given by giving notice pursuant to this Section.

21.     **Merger -- Complete Agreement.** This Agreement constitutes the entire agreement between the parties. There are no understandings, agreements or representations, oral or written, not specified herein regarding this Agreement. Any and all prior agreements or representations respecting the subject matter hereof, whether written or oral, expressed or implied, are hereby terminated and of no further effect. No amendment, consent, or waiver of terms of this Agreement shall bind either party unless in writing and signed by both parties. Any such amendment, consent, or waiver shall be effective only in the specific instance and for the specific purpose given. The parties, by their signatures below, acknowledge having read and understood the Agreement and agree to be bound by its terms and conditions.

**(The next page is the Signature Page.)**

9 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT (

EXHIBIT B
PAGE 32

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized agents effective as of the date and year first above written.

**Golden Temple of Oregon, Inc.**

By: _Sopurkh Khalsa_
Its: _President_

**Harbhajan Singh Khalsa Yogiji and Inderjit Kaur Living Trust**

By: _____
Harbhajan Singh Khalsa Yogiji, Trustee

_____
**Harbhajan Singh Khalsa Yogiji**

**Attachments:**

Exhibit 1.4 – Licensed Trademarks
Exhibit 1.5 – Licensed Products
Exhibit 6.1 – Royalty Rates
Exhibit 14.3 – Promissory Note

STATE OF NEW MEXICO
COUNTY OF SANTA FE

SIGNED IN MY PRESENCE ON
JULY 22, 2004 at ESPANOLA N.M.
by SOPURKH K. KHALSA AND
HARBHAJAN SINGH KHALSA YOGIJI

_____
NOTARY   COMM EXP
10/12/0?

10 - NONEXCLUSIVE TRADEMARK LICENSE AGREEMENT

EXHIBIT B
PAGE 33

2 of 2



– Yogi
Bhajan

(B/w copy
of color image)

| Cereal | |
|---|---|
| **WHA GURU CHEW** | |
| 500101-02 | Peanut Cashew |
| 500102-02 | Sesame Almond |
| 500103-02 | Cashew Almond |
| 511113-02 | Cashew Vanilla |
| 511114-02 | Almond Ginger |
| | |
| **PILLOW PACK** | |
| 100512-02 | Super Nutty |
| 100511-02 | Crisp & Crunchy |
| 100510-02 | Wild Blueberry |
| 131122-02 | NFA Strawberry |
| 100602-02 | LF Fruit Muesli |
| | |
| **PEACE CEREAL** | |
| 138003-02 | Apple Cinnamon Crisp |
| 138004-02 | Raspberry Ginger Crisp |
| 138005-02 | Vanilla Almond Crisp |
| 138006-02 | Maple Raisin Crisp |
| 138007-02 | Wild Berry Crisp |
| 138008-02 | Mango Passion Crisp |
| 138009-02 | Maple Pecan Crisp |
| 191101-02 | Rainforest Vanilla Nut |
| 191102-02 | Rainforest Banana Nut |
| 138013-02 | Hearty Raisin Bran |
| 138011-02 | Puffed Harvest |
| 138014-02 | Essential 10 |
| | |
| **BULK** | |
| 141550-03 | LF Apple Cinnamon |
| 141551-03 | LF Raisin Almond |
| 141552-03 | LF Straw/Raspberry |
| 141531-03 | Organic Mango Passion |
| 141510-03 | Coconut Almond |
| 141512-03 | Fruit 'N Nut |
| 141522-03 | Wild Blueberry |
| 141513-03 | Cinn-Apple-Raisin |
| 141514-03 | Maple Almond |
| 141520-03 | Super Nutty |
| 141538-03 | Crisp & Crunchy |
| 141541-03 | Cranberry Orange Crunch |
| 141542-03 | Berry Banana Burst |
| 141543-03 | Maple Pecan Dream |
| 141544-03 | Country Pumpkin Spice |
| 141525-03 | French Vanilla Almond |
| 141526-03 | Power Crunch |
| 191430-03 | Rainforest Bulk |
| 141571-03 | 35% Fruit Muesli |
| 141572-03 | Lite Muesli |

Page 0

EXHIBIT B
PAGE 35

| | |
|---|---|
| 141573-03 | Swiss Style Muesli |
| 141527-03 | Ginger Snap |
| 141574-03 | Cherry Vanilla |
| 141586-03 | Vanilla Macaroon |

**Tea**

**WELLNESS TEAS**

| | |
|---|---|
| 245001-02 | BEDTIME |
| 245004-02 | BREATHE DEEP |
| 245002-02 | CALMING TEA |
| 245009-02 | WINTER RELIEF |
| 245008-02 | DETOX |
| 245010-02 | ECH. IMMUNE SUPPORT |
| 245014-02 | FASTING |
| 245012-02 | GET REGULAR |
| 245011-02 | GINGER |
| 245025-02 | GINKGO IQ |
| 245007-02 | GINSENG ROYAL VITALITY |
| 245033-02 | JOINT COMFORT TEA |
| 245030-02 | KAVA STRESS RELIEF |
| 245017-02 | LEMON GINGER |
| 245023-02 | PEACH DETOX |
| 245024-02 | RASPBERRY GINGER |
| 245032-02 | ST JOHNS WORT |
| 245003-02 | STOMACH EASE |
| 245018-02 | THROAT COMFORT |
| 245015-02 | WOMAN'S MOON CYCL |
| 245005-02 | WOMAN'S DONG QUAI |
| 245043-02 | RASPBERRY LEAF |
| 245044-02 | MOTHER TO BE |
| 245045-02 | NURSING MOM |

**GREEN TEAS**

| | |
|---|---|
| 245028-02 | GREEN TEA REJUVINATION |
| 245021-02 | GRN TEA KOMBUCHA |
| 245037-02 | GREEN TEA DECAF |
| 245027-02 | GREEN TEA ENERGY |
| 245036-02 | GT SUPER ANIT-OX |
| 245026-02 | GREEN TEA TRIPLE ECHIN. |

**CHAI TEAS**

| | |
|---|---|
| 241531-02 | BLACK CHAI TEA |
| 241532-02 | GREEN CHAI TEA |
| 241533-02 | REDBUSH CHAI TEA |

**BULK TEAS**

| | |
|---|---|
| 241001-16 | CIN SPICE C&S 3OZ CTN |
| 241530-11 | CIN-SPICE C&S  1 LB |

**SIMPLY GREEN TEAS**                                Page 1

EXHIBIT B
PAGE 36

| | |
|---|---|
| 245040-02 | SIMPLY GREEN TEA MATE |
| 245041-02 | SIMPLY DECAF GREEN TEA |
| 245042-02 | SIMPLY GREEN TEA |

| BEVERAGE TEAS | |
|---|---|
| 241514-02 | CLASSIC INDIA SPICE TEA |
| 241516-02 | EGYPTIAN LICORICE TEA |
| 241521-02 | HIBISCUS PARADISE TEA |
| 241523-02 | DECAFFE ROAST TEA |
| 241524-02 | ANDES YERBA MATE |
| 241525-02 | VANILLA HAZELNUT |
| 241526-02 | COCOA SPICE TEA |
| 241527-02 | EGYPTIAN LICORICE MINT |
| 241528-02 | AFRICAN REDBUSH PEACH |

| Tea Concentrates | |
|---|---|
| 245501-03 | CLSIC INDIA SPICE TEA LATTE |
| 245502-03 | VANILLA HZELNT TEA LATTE |

| SUNSHINE SPA | |
|---|---|
| Perfume Oils | |
| 369514-01 | Arabian Musk |
| 369534-01 | Gardenia |
| 369544-01 | Honeysuckle |
| 369554-01 | Jasmine |
| 369564-01 | Jasmine & Rose |
| 369594-01 | Musk |
| 301404-01 | Omar |
| 301414-01 | Patchouli |
| 301424-01 | Rose |
| 301464-01 | Wood Spice |
| 369586-01 | Lavender |
| 369590-01 | Vanilla |
| 369587-01 | Mango |
| 369588-01 | Sensuality |
| 369589-01 | Tangerine |
| 369585-01 | Cucumber Melon |

| BODY OILS | |
|---|---|
| 311208-08 | Pure Almond |
| 311209-08 | Vanilla |
| 311213-08 | Lavender |
| 311212-08 | Sandalwood |
| 311214-08 | Muscle Comfort |
| 311215-08 | Rest & Relax |

| Salt Scrubs | |
|---|---|
| 312002-20 | Lavender |
| 312003-20 | Pprmnt-Rsmry |

9/13/04
Per Parampal

Yes

Yes

Page 2

EXHIBIT B
PAGE 57

| | |
|---|---|
| 312001-20 | Vanilla |
| 312004-20 | Tangerine Salt Scrubs |
| | |
| **Sugar Scrubs** | |
| 312005-20 | Vanilla Orange Scrubs |
| 312006-20 | Mango Ginger Scrubs |
| | |
| **Body Butters** | |
| 312127-07 | Cucumber Melon |
| 312128-07 | Lavender |
| 312129-07 | Mango |
| 312126-07 | Vanilla Orange |
| | |
| **Herbal Therapy Oils** | |
| 311901-02 | Narayan Oil |
| 311902-02 | Spirit Of GRD |
| 311903-02 | Espirit De Cupid |
| | |
| **Herbal Gems** | |
| 651001-01 | Royal Vitality - 1R |
| 651002-01 | Digest Rite - 2R |
| 651003-01 | Trinity Root - 3R |
| 651004-01 | Relax and Relieve - 7R |
| 651005-01 | Male Treasures - 14R |
| 651006-01 | Energy Tresures - 42R |
| 651007-01 | Cold Comfort - 96R |
| 651008-01 | Royal Heart - 108R |
| 651009-01 | Joint Comfort |
| 651010-01 | Women's Treasures |
| 651011-01 | Joyful Mood |
| 651012-01 | Immune Gold |
| 651013-01 | Sleep Rite PM |
| 651014-01 | Royal Slender |
| 651015-01 | Brain Plus |
| 651016-01 | Great Royal Diet |

*Handwritten annotations: "Yes" marks beside Sugar Scrubs, Body Butters, Herbal Therapy Oils (with crossed-out "No Yes"), and Herbal Gems sections.*

Page 3

EXHIBIT B
PAGE 36

**Exhibit 6.1**

**Royalty Rates**

_For Annual Gross Sales during each calendar year:_   ok

| Up to | $25,000,000 | 3.5% |
|-------|-------------|------|
| In excess of | $25,000,000 | |
| up to | $50,000,000 | 0.50% |
| In excess of | $50,000,000 | |
| up to | $100,000,000 | 0.25% |
| In excess of | $100,000,000 | 0.10% |

EXHIBIT B
PAGE 39



# Yogi Bhajan
# Founder